IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


PROTOCOL, LLC,                        )
a Delaware limited liability          )
company,                              )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )          1:12CV460
                                      )
DONALD BRUCE HENDERSON, JR.,          )
individually and doing               )
business as VEND SOUTH,               )
                                      )
          Defendant.                  )


## AMENDED MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court is the Rule 12(b) Motion to
Dismiss for Lack of Personal Jurisdiction and Improper Venue or,
in the Alternative, to Transfer Venue Under 28 U.S.C. § 1404
filed by Defendant Donald Bruce Henderson, Jr. (Doc. 13).
Defendant has filed a memorandum (Doc. 14) and affidavit (Doc.
13-1) in support of his motion; Plaintiff Protocol, LLC, has
filed a response (Doc. 16) and affidavit (Doc. 15) in
opposition; and Defendant has filed his reply (Doc. 19) and an
additional affidavit (Doc. 19-1).  Defendant's motion is now
ripe for adjudication, and for the reasons that follow, this
court will grant the motion.

## I.    PROCEDURAL HISTORY

Plaintiff Protocol, LLC, is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina.  (Complaint ("Compl.") (Doc. 1) ¶ 1.)  Plaintiff is an international supplier of over-the-counter medications, personal products, and novelty items sold via wall-mounted vending dispensers.  (Id. ¶ 7; Affidavit of Douglas M. Lang ("Lang Aff.") (Doc. 15) ¶ 2.)

Plaintiff brought this action alleging various causes of action arising from Defendant's breach of a Franchise Agreement, a 2007 Operation Agreement, and Product Purchase Agreement.

In the past, Plaintiff has offered franchises for the operation of multi-vending businesses that sell, place, service, and lease vending machines.  (Compl. (Doc. 1) ¶ 8; Lang Aff. (Doc. 15) ¶ 3.)  Plaintiff Protocol, LLC, is the successor of Protocol, Inc., a Delaware corporation with principal offices in Minnesota.  (Lang Aff. (Doc. 15) ¶ 4.)  Plaintiff was formed in 1998, and in 2006, moved its offices from Minnesota to Greensboro, North Carolina, where it is currently located.  (Id. ¶ 5.)  Franchisees would purchase an inventory of vending machines and products and then distribute those machines by (1) selling machines directly to businesses, (2) placing machines at

businesses and sharing the revenue, or (3) installing machines in workplaces and receiving a monthly fee to service and stock the machines. (Compl. (Doc. 1) ¶ 9; Lang Aff. (Doc. 15) ¶ 3.) Plaintiff would assist its franchisees with obtaining accounts by soliciting national and regional accounts for placement of the vending machines. (Compl. (Doc. 1) ¶ 20.) Plaintiff also operates a number of its own machines. (Id. ¶ 8.)

Defendant Donald Bruce Henderson, Jr., resides in Grand Prairie, Texas. (Id. ¶ 3; Affidavit of Donald Bruce Henderson ("First Henderson Aff.") (Doc. 13-1) ¶¶ 1-2.) His business relationship with Protocol, Inc., began while Protocol, Inc., was located in Minnesota, and he has operated and serviced Protocol vending machines since 1995. (Compl. (Doc. 1) ¶ 16; First Henderson Aff. (Doc. 13-1) ¶ 6.) In August 2005, Defendant purchased from Plaintiff, which was still located in Minnesota, a route in Florida, Alabama, Mississippi, Louisiana, and Texas of about 600 to 700 preinstalled vending machines. (First Henderson Aff. (Doc. 13-1) ¶ 10.) Defendant has never operated any of Plaintiff's vending machines in North Carolina. (Id. ¶ 17.)

In 2006 Douglas M. Lang, Plaintiff's President, was informed that Alfred Turene Newell wanted to terminate his

franchise relationship with Plaintiff.[1]  (Lang Aff. (Doc. 15) ¶
6.)  Lang "reached out to" Defendant about taking over Newell's
vending machines because he thought Defendant might be
interested in expanding his routes.  (Id. ¶ 7.)

By the end of 2006, Plaintiff had moved almost all of its
operations, including its principal office, from Minnesota to
North Carolina.  (Id. ¶ 5.)  In February 2007, Newell
transferred his rights, interests, and obligations under the
Franchise Agreement to Defendant Henderson pursuant to an Asset
Purchase Agreement.  (Compl. (Doc. 1) ¶ 15; Lang Aff. (Doc. 15)
¶ 8.)  The machines Defendant purchased were on a route in
Georgia, Alabama, Florida, Mississippi, and Louisiana.  (First
Henderson Aff. (Doc. 13-1) ¶ 11.)  Defendant wrote and mailed a
check to Plaintiff for $2,025.10, which included a $500
"Franchise Transfer Fee" as required by Paragraph 13(b) of the
Franchise Agreement. (Compl. (Doc. 1) ¶ 15; Lang Aff. (Doc. 15)
¶ 8 and Attach., Ex. C (Doc. 15-3).)  In addition, Lang

---

[1] On October 6, 1997, Alicia Fraser entered a written
Franchise Agreement with Protocol, Inc., a Delaware corporation
that had it principal offices in Minnesota.  (Compl. (Doc. 1)
¶¶ 10-11; see also Lang Aff., Attach., Ex. B (the Franchise
Agreement) (Doc. 15-2).)  Fraser subsequently transferred her
rights, interests, and obligations under the Franchise Agreement
to Newell.  (Compl. (Doc. 1) ¶ 14.)  In July 1998 the assets of
Protocol, Inc., including its franchise agreements, were
transferred to Plaintiff. (Id. ¶ 10.)

requested that the Franchise Agreement be transferred to Defendant, and Defendant agreed. (Lang Aff. (Doc. 15) ¶ 8.) Plaintiff approved the transfer. (Compl. (Doc. 1) ¶ 18.)

This Franchise Agreement is one of the claims Plaintiff alleges Defendant breached. (Compl. (Doc. 1) ¶¶ 15, 18, 21, 34-46.) The Franchise Agreement (Compl., Ex. A (Doc. 1-1)) states, in part, that

> [N]o action or proceeding involving this Agreement or any aspect of the relationship between Protocol and Franchisee, shall be commenced by either party except in the District Courts of Minnesota, County of Dakota, or the Federal District Court in Hennepin County . . . . The parties agree, however, that if either party seeks injunctive relief against the other, it may initiate that action in the county in which the other party remains its principal place of business.

(Id. at 10.)[2]

Defendant also entered into other agreements with Plaintiff after Plaintiff had moved its operations to North Carolina. On March 5, 2007, the parties executed an Operation Agreement ("2007 Operation Agreement") that Lang had presented to

---

[2] All citations in this Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

Defendant for his signature.[3]  (Comp. (Doc. 1) ¶ 24; Lang Aff.
(Doc. 15) ¶ 9 and Attach., Ex. D (2007 Operation Agreement and
addenda) (Doc. 15-4).)  The 2007 Operation Agreement set forth
the terms for servicing the national and regional accounts for
which Defendant was responsible.

Notably, the 2007 Operation Agreement contains a provision
which states, "The following provisions of the Franchise
Agreement will be a part of this Agreement and are hereby
incorporated herein by reference: . . . (iii) paragraph entitled
'Enforcement.'"  (Lang Aff., Ex. D (Doc. 15-4) at 8.)  The
"Enforcement" paragraph of the Franchise Agreement (Doc. 1-1 at
9-10) contains the Minnesota forum-selection clause described
above.  Although Protocol had a principal place of business in
North Carolina in 2007, its contracts still required that civil
actions be filed in Minnesota.

---

[3] Defendant contends that Plaintiff was not based in North
Carolina in March 2007 because it had not yet received a
certificate of authority to do business in North Carolina.
However, the fax number at the top of each page of the 2007
Operation Agreement shows a North Carolina area code.  (See Lang
Aff., Ex. D (Doc. 15-4) at 2-9.)

Defendant also argues that he was "buffaloed" into signing
the agreement "under threat of financial ruin" from Plaintiff.
(Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Doc.
14) at 14.)  According to Lang, however, Defendant never
indicated any desire to negotiate that agreement.  (Lang Aff.
(Doc. 15) ¶ 12.)

Defendant also executed approximately twenty National/
Regional Account Addenda that set forth revenue reporting,
commission, and management fee requirements, among others, for
particular accounts.  (See Lang Aff, Ex. D (Doc. 15-4) at 10-
40.)  Pursuant to the 2007 Operation Agreement and the
National/Regional Account Addenda, Defendant was required to
submit quarterly revenue reports and remit management fees and
commissions to Plaintiff.[4]  (See id.)

In February 2011, Defendant executed an Equipment and
Product Purchase Agreement.  (Compl. (Doc. 1) ¶ 30; Lang Aff.
(Doc. 15) ¶ 14 and Attach., Ex. H (Doc. 15-8).)  In exchange for
Defendant's agreement to purchase products to stock his vending
machines exclusively from Plaintiff until December 31, 2011,
Plaintiff granted Defendant a twenty-five percent discount on
those products.  (Compl. (Doc. 1) ¶¶ 31-32.)  That agreement
lists Plaintiff's Greensboro address at the bottom of the last
page.  (See Lang Aff., Ex. H (Doc. 15-8) at 3.)

With each agreement at issue in this case, Defendant signed
the agreement in Texas before faxing it to Plaintiff's office in

---

[4] Defendant mailed the quarterly revenue reports until
Plaintiff implemented an online revenue reporting system.  (Lang
Aff. (Doc. 15) ¶ 15.)  Thereafter, Defendant submitted the
required quarterly reports online.  Defendant then mailed all
management fees and other required payments to Plaintiff in
Greensboro.  (Id.)

North Carolina.  Lang then executed the agreements and returned them to Defendant by fax.  (Lang Aff. (Doc. 15) ¶ 9.)  This process reflected Plaintiff's standard procedure for executing any contract with one of its distributors or franchisees.  (Id. ¶ 14.)  Defendant has never signed an agreement in North Carolina, and none of the contracts between Plaintiff and Defendant included a North Carolina forum-selection clause or choice-of-law provision.  (First Henderson Aff. (Doc. 13-1) ¶ 18.) To the contrary, the Franchise Agreement and the 2007 Operation Agreement contained a Minnesota forum-selection clause.

Defendant also emailed purchase orders to Plaintiff's Greensboro office when he needed products to stock the vending machines.  (Lang Aff. (Doc. 15) ¶ 16 and Attach., Ex. J (Doc. 15-10) (samples of purchase orders submitted to Plaintiff's Greensboro office).)  Defendant submitted fourteen purchase orders in 2007, six in 2008, seven in 2009, five in 2010, and seven in 2011, all to Plaintiff's Greensboro address.  (Lang Aff. (Doc. 15) ¶ 17.)  Plaintiff's products are packaged in Fergus Falls, Minnesota, and Albany, Georgia, and then almost always shipped to North Carolina.  (Id. ¶ 18.)  The products are then sent to the distributor who placed the order.  (Id.)

Defendant also communicated with Lang on a number of occasions. Those communications were largely through email, although they spoke over the phone a handful of times each year. (First Henderson Aff. (Doc. 13-1) ¶ 23.) Except for attending occasional conferences hosted by Plaintiff, Defendant has never visited North Carolina for business. (Id. ¶ 17.) Defendant has never owned property in North Carolina nor has he maintained an office in North Carolina. (Id. ¶¶ 20-21.)

In December 2011, Defendant sold his vending machine business to Hygeia Marketing Corporation, which has its principal place of business in Kannapolis, North Carolina. (Compl. (Doc. 1) ¶ 45; Lang Aff., Attach., Ex. M (Doc. 15-13).) Shortly thereafter, Plaintiff filed suit in the District of Minnesota because of the forum-selection clause in the Franchise Agreement. After Defendant moved to dismiss for lack of personal jurisdiction, Plaintiff voluntarily dismissed that case and refiled the action in the Middle District of North Carolina.

The Complaint alleges a number of claims against Defendant including: (1) breach of the Franchise Agreement, the 2007 Operation Agreement, and the Equipment and Product Purchase Agreement; (2) unjust enrichment; (3) tortious interference with contractual relations; (4) tortious interference with

prospective business advantage; (5) fraudulent

misrepresentation; and (6) negligent misrepresentation.

Plaintiff also demands an audit of Defendant's business books

and records pursuant to Paragraph 4 of the 2007 Operation

Agreement.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) "provides for

dismissal where the court lacks personal jurisdiction over a

particular named defendant." Fields v. Trollinger, No.

1:10cv296, 2011 WL 3422689, at *4 (W.D.N.C. Mar. 28, 2011).

When a defendant properly challenges the court's personal

jurisdiction through a Rule 12(b)(2) motion, "the jurisdictional

question thus raised is one for the judge, with the burden on

the plaintiff ultimately to prove the existence of a ground for

jurisdiction by a preponderance of the evidence." Combs v.

Bakker, 886 F.2d 673, 676 (4th Cir. 1989).

> If the existence of jurisdiction turns on disputed
> factual questions the court may resolve the challenge
> on the basis of a separate evidentiary hearing, or may
> defer ruling pending receipt at trial of evidence
> relevant to the jurisdictional question. But when, as
> here, the court addresses the question on the basis
> only of motion papers, supporting legal memoranda and
> the relevant allegations of a complaint, the burden on
> the plaintiff is simply to make a prima facie showing
> of a sufficient jurisdictional basis in order to
> survive the jurisdictional challenge. In considering
> a challenge on such a record, the court must construe

all relevant pleading allegations in the light most
favorable to the plaintiff, assume credibility, and
draw the most favorable inferences for the existence
of jurisdiction.

Id. (citations omitted).

"Where the defendant has provided evidence, however, that
denies facts essential for jurisdiction, the plaintiff must
present sufficient evidence to create a factual dispute on each
jurisdictional element that has been denied by the defendant and
on which the defendant has presented evidence." Vogel v.
Wolters Kluwer Health, Inc., 630 F. Supp. 2d 585, 594 (M.D.N.C.
2008); see also Wolf v. Richmond Cnty. Hosp. Auth., 745 F.2d
904, 908 (4th Cir. 1984) ("In ruling on a motion to dismiss for
lack of personal jurisdiction, the allegations of the complaint,
except insofar as controverted by the defendant's affidavit,
must be taken as true." (internal quotation marks omitted)).

For this court to assert personal jurisdiction over a non-
resident defendant, two conditions must be satisfied.  First,
the court's exercise of personal jurisdiction must be authorized
by North Carolina's long-arm statute.  Christian Sci. Bd. of
Dirs. of the First Church of Christ, Scientist v. Nolan, 259
F.3d 209, 215 (4th Cir. 2001).  Second, the exercise of
jurisdiction must comport with the requirements of due process.
Id.  Because "North Carolina's long-arm statute is construed to

extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause," the two-part inquiry "collapse[s] into a single inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Id. (internal quotation marks omitted).

When considering whether the exercise of personal jurisdiction would comport with the requirements of due process, the court should "evaluate 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.'" Christian Sci., 259 F.3d at 217 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." Carefirst of Md., Inc. v.

Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003).  If the defendant's contacts with the forum state "form the basis for the suit," then the court may have "specific jurisdiction" over the defendant.  Id.  Courts consider the following when determining whether specific jurisdiction exists: "(1) the extent to which the defendant has purposefully availed [himself] of the privilege of conducting activities in the state; (2) whether the plaintiff['s] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  Id. (internal quotation marks omitted).

If the defendant's contacts with the forum state do not form the basis for the suit, then the court may still have "general jurisdiction" over the defendant.  See id.; see also Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).  However, the standard for establishing general personal jurisdiction over a defendant is "a more demanding standard than is necessary for establishing specific jurisdiction."  ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002).  In order to have general personal jurisdiction over a defendant, "the defendant's

activities in the State must have been continuous and systematic." Id. (internal quotation marks omitted).

Plaintiff appears to contend this court has specific jurisdiction over Defendant.[5] (See Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss (Doc. 16) at 9 ("The Fourth Circuit has synthesized the due process requirements for asserting specific personal jurisdiction . . . ."). This court does not find Defendant's contacts sufficient to confer general jurisdiction and will only therefore consider whether specific jurisdiction has been established.

## III. ANALYSIS

Defendant moves to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3). In the alternative, he requests a transfer of venue to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). For the reasons that follow, this court finds that Plaintiff has failed to present sufficient evidence to support a prima facie finding that Defendant has purposefully availed himself of the benefits and protections of North Carolina law such that this court may properly exercise specific jurisdiction over Defendant. This

---

[5] Plaintiff has not argued that a North Carolina court could constitutionally exercise general jurisdiction over Defendant.

court will therefore grant Defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction.[6]

### A.   Rule 12(b)(2) Motion

Because North Carolina construes its long-arm statute as providing for personal jurisdiction to the fullest extent permitted by the Due Process Clause, this court considers whether Plaintiff has presented a prima facie case that Defendant has such "minimum contacts" with North Carolina to confer personal jurisdiction in this state.  It is undisputed that Defendant maintained no place of business in North Carolina, had no office in North Carolina, and does not own property in North Carolina.  Furthermore, the original forum-selection clause provided for legal action in Minnesota, not North Carolina.

Although there are no "talismanic jurisdictional formulas," Burger King, 471 U.S. at 485, the Fourth Circuit has cited a number of nonexclusive factors that a court may consider in the business context when determining whether a defendant has purposefully availed himself of the benefits and protections of a particular jurisdiction:

---

[6] Based on this finding, this court does not address Defendant's motions relating to venue.

- whether the defendant maintains offices or agents in the forum state;

- whether the defendant owns property in the forum state;

- whether the defendant reached into the forum state to solicit or initiate business;

- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;

- whether the parties contractually agreed that the law of the forum state would govern disputes;

- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;

- the nature, quality and extent of the parties' communications about the business being transacted; and

- whether the performance of contractual duties was to occur within the forum.

Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (citations omitted). "The relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfie[s] due process." English & Smith v. Metzger, 901 F.2d 36, 39 (4th Cir. 1990). "The analysis must focus on the nature, quality, and quantity of the contacts, as

well as their relation to the forum state." Consulting Eng'rs, 561 F.3d at 279 n.5.

In its Complaint, Plaintiff alleges that this court may properly exercise personal jurisdiction over Defendant because (1) he "entered into contracts with a North Carolina-based company regarding the very subject of this action, including but not limited to a contract entitled 'Installation and Operation Procedures for National and Regional Accounts'"; (2) he "carried out a business relationship with a North Carolina Company"; (3) he "paid management fees to a North Carolina company"; and (4) "his actions have given rise to injuries in the State of North Carolina." (Compl. (Doc. 1) ¶ 5.)

According to Defendant, this case is based on allegations that he "breached contractual obligations with [Plaintiff] while living in Texas and operating a sole proprietorship through which [he] owned and serviced wall-mounted vending machines located in Texas and a handful of other states, none of which are [in] North Carolina." (Def.'s Mem. (Doc. 14) at 1.) Defendant characterizes Plaintiff's argument in favor of personal jurisdiction as based solely on the fact that "Protocol allegedly has a North Carolina headquarters and therefore suffered its alleged nonpayment injuries under contract(s) with

[Defendant] – in North Carolina." (Id. at 12.) Defendant also contends that Plaintiff's unilateral move to North Carolina from Minnesota does not confer personal jurisdiction in this court. Plaintiff, on the other hand, contends that Defendant has sufficient contacts and activity with Plaintiff in this state to support specific jurisdiction.

As Defendant correctly notes, a contract with an out-of-state party does not always establish minimum contacts in the plaintiff's home forum, even when the dispute arises from the contract. See Burger King, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); Le Bleu Corp. v. Standard Capital Grp., Inc., 11 Fed Appx. 377, 380 (4th Cir. 2001); Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 681 (M.D.N.C. 2011); Burlington Indus., Inc. v. Yanoor Corp., 178 F. Supp. 2d 562, 567 (M.D.N.C. 2001). The contract itself is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317 (1943). Therefore, a

court should evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" when determining "whether the defendant purposefully established minimum contacts with the forum." Burger King, 471 U.S. at 479. The contract "must have a substantial connection with the state so that the nature and quality of a defendant's relationship to the forum 'can in no sense be viewed as random, fortuitous, or attenuated.'" Burlington Indus., 178 F. Supp. 2d at 567 (quoting Burger King, 471 U.S. at 480).

Plaintiff relies on four cases where a court in a franchisor's home state exercised personal jurisdiction over an out-of-state franchisee.[7] In Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), the Supreme Court held that a Florida district court could exercise specific jurisdiction over an out-of-state fast food franchisee without offending due process. The franchisee had no physical ties to Florida other than attending a brief training course. Id. at 479. However, the Court found

---

[7] Plaintiff also contends that "personal jurisdiction can generally be asserted over nonresident franchisees." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Br.") (Doc. 16) at 11.) The Burger King Court, however, rejected any general rule or presumption that a court located in an interstate franchisor's home state may constitutionally exercise personal jurisdiction over an out-of-state franchisee. 471 U.S. at 485 n.28.

that the franchise agreement at issue had a substantial connection with Florida because the franchisee deliberately reached out beyond his home state and "negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization," and thereby "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with [the franchisor] in Florida." Id. at 479-80. The Court also found that the franchisee's refusal to make required payments and his continued use of trademarks and confidential business information caused foreseeable injuries in Florida. Id. at 480. In addition, the franchise documents indicated that the franchisor operated from Miami, "that all relevant notices and payments [had to] be sent there, and that the agreements were made in and enforced from Miami." Id. Furthermore, the franchise agreement included a Florida choice-of-law provision. Id. at 481-82. Finally, the Court noted that the franchisees had "carried on a continuous course of direct communications by mail and by telephone" with the Miami headquarters and that the franchisor's headquarters "made the key negotiating decisions" out of which the case arose. Id. at 481.

In Econo Lodges Int'l, Inc. v. Peck, No. 93-1519, 1993 WL
369262 (4th Cir. Sept. 22, 1993) (unpublished) (per curiam), the
Fourth Circuit held that a hotel franchisee from Florida was
subject to specific personal jurisdiction in Charlotte, North
Carolina, the hotel chain's principal place of business.  The
franchise agreement stated that the franchisor's principal place
of business was in Charlotte, and it required the franchisees to
pay monthly royalty and advertising fees in addition to
submitting regular financial reports.  Id. at *2.  Further, the
franchisor provided the franchisees with marketing and
advertising materials, advertising assistance, and access to a
computer reservation center.  Id.

Hardee's Food Sys., Inc. v. Beardmore, 169 F.R.D. 311
(E.D.N.C. 1996), and Hardee's Food Sys., Inc. v. Rosenblatt, 44
F. Supp. 2d 767 (E.D.N.C. 1998), are similar cases involving
fast food franchises.  In Beardmore, the franchisees did not
have offices or employees in North Carolina, nor did they
conduct business, advertise, or sell any products in the state.
169 F.R.D. at 315.  However, the court found that it could
constitutionally exercise specific personal jurisdiction over
those out-of-state franchisees because they reached into North
Carolina and created continuing relationships and obligations

with the North Carolina franchisor.  Id.  Specifically, the
parties had a number of separate franchise agreements that
"contemplate[d] carefully structured relationships that were to
last twenty years."  Id. at 316.  In addition, the agreements
stated that the franchisor was a North Carolina corporation with
its principal place of business in Rocky Mount, North Carolina;
included a North Carolina choice-of-law provision; and required
the franchisee to make various monthly payments.  Id.  The court
also based its decision on the fact that the franchisees had
purchased food, equipment, and other items from the franchisor
for twelve years.  Id.

In Rosenblatt, the franchisees and North Carolina
franchisor had entered multiple agreements requiring continuous
relationships.  44 F. Supp. 2d at 769.  Those agreements clearly
indicated that the franchisor was based in North Carolina, and
each included a North Carolina choice-of-law provision.  Id.
The franchisees were also required to pay monthly royalty and
advertising fees and submit monthly royalty reports.  Id.

Plaintiff contends that the facts in the instant case are
"strikingly similar" to these franchise cases.  (Pl.'s Br. (Doc.
16) at 13.)  Although some similarities exist, there are at
least two significant distinctions.  First, no agreement cited

by Plaintiff includes a North Carolina choice-of-law provision or forum-selection clause.  The existence of a choice-of-law provision, or some other reference to the franchisor's principal place of business, was a factor in the reasoning of each of the cases Plaintiff cited.  See Burger King, 471 U.S. at 482 (finding that a choice-of-law provision "reinforced" the defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); Econo Lodges, 1993 WL 369262, at *2 ("The agreement specifically states that [the franchisor's] principal place of business is Charlotte."); Rosenblatt, 44 F. Supp. 2d at 768 ("The agreements at issue contain a North Carolina choice-of-law provision, state that [the franchisor] is a North Carolina corporation with headquarters in Rocky Mount, North Carolina, and require payment of fees into North Carolina."); Beardmore, 169 F.R.D. at 316 (considering, among other factors, that the fourteen franchise agreements specifically stated that the franchisor was a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina, and included North Carolina choice-of-law provisions).  In this case, only the Equipment and Product Purchase Agreement includes any reference to Plaintiff's Greensboro address.  The 2007 Operation Agreement was faxed from

a Greensboro area code, but the agreement itself does not refer
to North Carolina.  In fact, that agreement incorporates the
"Enforcement" provision of the Franchise Agreement (Lang Aff.,
Ex. D (Doc. 15-4) at 8), requiring any dispute to be litigated
in Minnesota (Lang Aff., Ex. B (Doc. 15-2) at 10).  Thus, two of
the three contracts state that any litigation must be conducted
in Minnesota.

Second, unlike those cases, it was the franchisor that
approached the franchisee about expanding the business
relationship after Plaintiff moved its operations to North
Carolina.  Here, based on their longstanding relationship, Lang,
Protocol's President, "reached out" to Defendant about
purchasing Newell's vending machines and adopting a Franchise
Agreement that included a Minnesota forum-selection provision.
(Lang Aff. (Doc. 15) ¶ 7.)  Plaintiff also presented the 2007
Operation Agreement to Defendant for his signature.  It is
unclear from the record to what extent the terms of that
agreement were negotiable, but apparently, no negotiation in
fact took place.  Furthermore, Plaintiff presented each addendum
to the 2007 Operation Agreement to Defendant.  (See Lang Aff.,
Ex. D (Doc. 15-4) at 2 ("[The parties] agree that the following
will be the Installation and Operation Procedures for all

National and Regional Accounts that <u>Protocol provides Franchisee</u> <u>to service</u>." (emphasis added)).) There is no evidence in the record regarding who initiated the Equipment and Product Purchase Agreement; however, it appears to be a form agreement that would have been presented to Plaintiff's distributors and franchisees.

Although the fact that the agreements between the parties contemplate an ongoing relationship weighs in favor of specific jurisdiction, the Fourth Circuit "has given great weight to the question of who initiated the contact between the parties." <u>Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC</u>, No. 1:04CV00906, 2006 WL 288422, at *5 (M.D.N.C. Feb. 6, 2006); <u>see</u> <u>also</u> <u>CFA Inst. v. Inst. of Chartered Fin. Analysts of India</u>, 551 F.3d 285, 295 n.17 (4th Cir. 2009) ("Pursuant to applicable precedent, we are entitled to accord special weight to the fact that it was [the defendant] that initiated contact with [the plaintiff] in [the forum state]." (citing <u>Diamond Healthcare of</u> <u>Ohio, Inc. v. Humility of Mary Health Partners</u>, 229 F.3d 448, 451 (4th Cir. 2000))). This court finds this factor particularly relevant in distinguishing the instant case from the more typical franchisor-franchisee disputes discussed above. Here, Defendant initially contacted Plaintiff in Minnesota, the

subsequent contracts were initiated by Plaintiff's contact

("reaching out") to Defendant outside the State of North

Carolina. In addition, although Plaintiff waited to execute each

agreement until Defendant had already signed it, the state in

which an agreement becomes effective is not determinative.[8] See

English & Smith, 901 F.2d at 39 n.4 ("What is more important

[than where the agreement was made] is the extent of [the

defendant's] contacts with [the forum state], not whether, as a

technical matter, the contracts were formed there and [the forum

state's] law governs.").  It appears that Defendant's only

unsolicited contacts with North Carolina are the purchase

orders, certain communications with Lang, and infrequent visits

to the state for conferences hosted by Plaintiff.

This court also places less weight on the contracts in this

case because they are essentially standardized forms.  See

Autoscribe Corp. v. Goldman & Steinberg, No. 94-1749, 1995 WL

---

[8] It is well-settled under North Carolina law that the "test
of the place of a contract is as to the place at which the last
act was done by either of the parties essential to a meeting of
minds."  Bundy v. Commercial Credit Co., 200 N.C. 511, 515, 157
S.E. 860, 863 (1931).  However, this determination does not
tangibly impact the personal jurisdiction analysis. See English
& Smith, 901 F.2d at 39 n.4; see also Vance v. CHF Int'l, 914
F. Supp. 2d 669, 685 (D. Md. 2012) ("Even assuming Plaintiffs'
allegations are true regarding the formation of the contract [in
the forum state], the Court still finds that it cannot exercise
personal jurisdiction . . . .").

56662, at *5 (4th Cir. Feb. 3, 1995) (unpublished) (per curiam) (discounting the relevance of a licensing agreement because it was "a one-page preprinted form that prompted no negotiations" between the parties). Even if the contracts were not in fact presented on a take-it-or-leave-it basis, there is no evidence in the record of any negotiation between the parties with respect to any of the contracts. Accordingly, the contracts themselves say little about whether Defendant purposefully availed himself of the benefits and protections of North Carolina law.

With respect to the emails and phone calls between Defendant and Lang, this court notes "that an exchange of communications between two parties, one of whom is located in the forum state, in furtherance of a contract, will not generally constitute purposeful contact with the forum state for purposes of jurisdiction." WLC, LLC v. Watkins, 454 F. Supp. 2d 426, 436-37 (M.D.N.C. 2006); see also Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986) ("[T]he exchange of communications between Texas and Oklahoma in the course of developing and carrying out the contract was in itself also insufficient to constitute purposeful availment of the benefits and protections of Texas law."). Here, Defendant would contact

Lang if he had any questions about conducting his out-of-state routes.  The communications were directed at North Carolina only because Lang happened to be located there.  Cf. Autoscribe Corp., 1995 WL 56662, at *5; Sea-Roy Corp. v. Parts R Parts, Inc., No. 9:94CV00059, 1996 WL 557857, at *6 (M.D.N.C. July 30, 1996) ("[I]t is necessary to distinguish between a defendant's acts which are 'aimed at a plaintiff who is located in the forum' and those which are 'aimed at the forum itself.'" (quoting Covenant Bank for Sav. v. Cohen, 806 F. Supp. 52, 56 (D.N.J. 1992))).  Accordingly, this court places only limited weight on the communications between Lang and Defendant.

Although relevant contacts with North Carolina, this court does not find Defendant's submission of management fees and quarterly revenue reports compelling on the facts in this case. See, e.g., Diamond Healthcare, 229 F.3d at 452 ("While some acts required of and performed by [the defendant] necessitated its contact with Virginia – [the defendant] had to keep [the plaintiff] advised of legal or regulatory action taken against Project NuStart and any denial of payment from a payer source, and it also had to send monthly payments to Richmond – these requirements were incidental to [the defendant's] role under the contract."); Holt Oil & Gas Corp., 801 F.2d at 778 ("Given that

the material performance occurred in Oklahoma, the fact that
[the defendant] mailed payments to Texas does not weigh heavily
in our determination."); cf. Lee's Famous Recipes, Inc. v. Fam-
Res, Inc., No. 3:07cv24/MCR/EMT, 2007 WL 1451808, at *5 (N.D.
Fla. May 15, 2007) ("[Plaintiff] suggests that because
[defendant] sent payments and sales reports to [plaintiff's]
corporate office in Florida without objection . . . [defendant]
could reasonably anticipate being hauled into court in Florida.
The court disagrees."). Defendant was contractually required to
remit such fees and submit the reports; however, the bulk of his
performance under the agreements occurred outside of North
Carolina.

This court does not view the purchase orders emailed by
Defendant from Texas to Plaintiff's Greensboro address as
sufficient enough contacts to sway the analysis under Consulting
Engineers and thereby confer jurisdiction. Several courts have
found personal jurisdiction, in part, on the basis of purchase
orders sent into the forum state. See McCoy Lumber Indus., Inc.
v. Niedermeyer-Martin Co., 356 F. Supp. 1221, 1224-26 (M.D.N.C.
1973); Blue Ribbon Commodity Traders, Inc. v. Supermercados Mr.
Special, Inc., Civil Action No. 07-4036, 2008 WL 2468381, at *5
(E.D. Pa. June 18, 2008); Lantor, Inc. v. Nicassio Corp., No.

CA06 46S, 2007 WL 204015, at *7-9 (D.R.I. Jan. 24, 2007). A common theme unifying these cases is that each claim arose from a breach of a purchase order sent into a forum state. The specific contacts (the purchase orders) in these cases were closely related to the alleged causes of action (breach of contract). The Fourth Circuit has emphasized the importance of the connection between the alleged wrongdoing and the conduct with the forum state. See CEM Corp. v. Personal Chemistry, AB, 55 Fed. Appx. 621, 624-25 (4th Cir. 2003); Vishay Intertech., Inc. v. Delta Int'l Corp., 696 F.2d 1062, 1069 (4th Cir. 1982) ("In determining whether due process is satisfied, it is significant that the cause of action arises out of the defendant's contacts with the forum state."). In the present case, Plaintiff does not allege that Defendant breached a purchase order, but rather, alleges that Defendant failed to perform under a contract requiring exclusive purchases of materials from Plaintiff (based on a contract executed outside of North Carolina). As such, the nexus between the contacts and the alleged wrongdoing distinguishes those cases finding personal jurisdiction based on purchase orders from this case.

Other cases have declined to exercise personal jurisdiction on the basis of purchase orders sent into the forum state. In

Hanes Companies, Inc. v. Contractor's Source, Inc., No. 1:08CV334, 2008 WL 4533989, at *14 (M.D.N.C. Oct. 6, 2008), the court found that a single disputed purchase order was insufficient to support specific jurisdiction. There, a Louisiana corporation purchased goods from a North Carolina corporation at varying frequencies and amounts over several years (aggregating over $300,000 of purchases through 11 orders in 2006; $32,000 of purchases in 2007). Id. at *2. Plaintiff in Hanes shipped all its goods from North Carolina to the out-of-state defendant. The Hanes court largely rejected the argument to aggregate the purchase orders unrelated to the single breach of contract claim arising out of the single disputed purchase order. Id. at *9 ("The magistrate judge [properly] declined to aggregate [the defendant's] other alleged contacts with North Carolina . . . [which were] not part of the contract [in dispute], noting that such an inquiry would be relevant only to a general jurisdiction analysis." (alterations in original) (internal quotations omitted) (citing Le Bleu Corp. v. Standard Capital Grp., Inc., 11 Fed. Appx. 377, 380 (4th Cir. 2001))). The decision in Hanes was reinforced by the fact the plaintiff "was purchasing only a small quantity of goods from

North Carolina, rather than injecting goods into the state through a sale." Hanes, 2008 WL 4533989, at *10.

In the present case, Plaintiff did not purchase the goods to supply Defendant within North Carolina nor were those goods shipped for ultimate use in North Carolina. Any goods sold by Plaintiff to Defendant originated outside the state of North Carolina and were shipped to Defendant through a distributor in North Carolina or directly to Defendant, all for use outside North Carolina. (Lang Aff. (Doc. 15) at 6.) Cf. Scullin Steel Co. v. Nat'l Ry. Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982) ("[S]olicitation by a nonresident purchaser for delivery outside the forum state is a more minimal contact than that of a (nonresident) seller soliciting the right to ship goods into the forum state." (internal quotation marks omitted)). Moreover, the alleged breach here arose from a separate contract executed outside North Carolina, not from one of the purchase orders sent into the state. In the larger context of the Consulting Engineers analysis, this court does not find the contacts from the purchase orders sent into North Carolina dispositive.

This court also finds that Defendant's infrequent visits to North Carolina for conferences hosted by Plaintiff and the purchase orders he submitted from 2007 to 2011 are of minimal,

if any, relevance to the specific jurisdiction inquiry because this case does not arise from those contacts. See GMAC Real Estate, LLC v. E.L. Cutler & Assocs., Inc., 472 F. Supp. 2d 960, 965 (N.D. Ill. 2006) ("Although [defendants'] representatives may have attended one franchise-related meeting in Illinois . . . this is not enough to establish that [defendant] had minimum contacts with Illinois . . . ."); Lee's Famous Recipes, 2007 WL 1451808, at *5 (finding that defendant's president attending a plaintiff-sponsored franchise conference in Florida was insufficient, even in light of other contacts, to support Florida's exercise of personal jurisdiction over the defendant franchisee). Furthermore, the fact that Plaintiff suffered the alleged injuries in North Carolina is not sufficient, on its own, to confer personal jurisdiction. See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997) ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").

Having considered the parties' arguments and the factors cited in Consulting Engineers, this court finds that exercising personal jurisdiction over Defendant in this case would not

comport with the requirements of due process.  This court makes the following findings with respect to each of the eight nonexclusive factors, which, on balance, weigh against the exercise of specific personal jurisdiction over Defendant in this case.

First, Defendant lives in Texas and maintained routes in Texas, Louisiana, Mississippi, Florida, Georgia, and Alabama. He has never serviced vending machines in North Carolina, nor has he ever maintained offices or agents in North Carolina. Second, although he is receiving payments from Hygeia Marketing Corporation, Defendant does not own any property in North Carolina.  Third, Defendant did not reach into North Carolina to solicit or initiate any of the agreements at issue in this case; instead, Defendant did agree to continue and expand a long-term business relationship with Plaintiff after Plaintiff had relocated to North Carolina, but Plaintiff proposed each expansion and there was little, if any, negotiation as to each expansion.  Fourth, in general, Defendant's business activities occurred outside of North Carolina.  Fifth, the parties have never agreed that North Carolina law would govern any dispute arising from their relationship or that North Carolina is the required forum for any dispute.  In fact, the Franchise

Agreement and, by incorporation, the 2007 Operation Agreement and its Addenda, requires that any dispute arising between the parties be litigated in Minnesota.  Sixth, the only in-person contact between Defendant and Plaintiff's representatives in North Carolina were the occasional conferences Plaintiff hosted for the individuals it worked with.  Seventh, the parties' communications about the business relationship were limited to communications between Defendant and Lang, which included some number of emails and a handful of phone calls each year.  The record is unclear concerning the nature of those communications.  Furthermore, there is no evidence that Defendant ever negotiated the terms of any agreement with Plaintiff.  Eighth, apart from submitting quarterly revenue reports to North Carolina via Plaintiff's online forms, mailing checks for fees and commissions to Protocol's Greensboro office, and sending purchase orders to Plaintiff, Defendant's performance of contractual duties occurred outside of North Carolina.

In sum, Defendant's contacts with North Carolina in this case fail to reach the "purposeful availment" threshold.  Rather, these contacts, even when viewed collectively, are more aptly categorized as random, fortuitous, and attenuated, such that an exercise of jurisdiction would offend "traditional

notions of fair play and substantial justice." Therefore, this court concludes an exercise of personal jurisdiction over Defendant would violate due process.

**B.  Motion for Prejudgment Attachment and Motion to Strike**

Also pending are Plaintiff's Motion for Prejudgment Attachment (Doc. 23) and Plaintiff's Motion to Strike the Rebuttal Affidavit of Donald Bruce Henderson, Jr. in Opposition to Plaintiff's Motion for Prejudgment Attachment (Doc. 33). This court will deny Plaintiff's Motion for Prejudgment Attachment.  Under Federal Rule of Civil Procedure 64, this court applies North Carolina's prejudgment attachment statute. Prejudgment attachment is "a proceeding ancillary to a pending principal action."  N.C. Gen. Stat. § 1-440.1(a).  Because this court is dismissing this case for lack of personal jurisdiction over Defendant, there is no longer a "pending principal action" to which the prejudgment attachment proceeding could be "ancillary."  In addition, even if this court could enter an order of attachment, "[n]o personal judgment, even for costs, may be rendered against a defendant unless personal jurisdiction has been acquired."   N.C. Gen. Stat. § 1-440.1(b).

This court's determination that the Motion for Prejudgment Attachment should be denied effectively moots the Motion to Strike.  Accordingly, this court will deny that motion as moot.

**IV.  CONCLUSION**

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendant's Rule 12(b) Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, in the Alternative, to Transfer Venue Under 28 U.S.C. § 1404 (Doc. 13) is **GRANTED** and that this case is **DISMISSED WITHOUT PREJUDICE.**[9]

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Prejudgment Attachment (Doc. 23) is **DENIED** and that Plaintiff's Motion to Strike the Rebuttal Affidavit of Donald Bruce Henderson, Jr. in Opposition to Plaintiff's Motion for Prejudgment Attachment (Doc. 33) is **DENIED AS MOOT.**

An Amended Judgment dismissing this action will be entered contemporaneously with this Amended Memorandum Opinion and Order.

This the 15th day of May, 2014.

_____
United States District Judge

---

[9] Pursuant to the Text Order entered May 9, 2014, the Memorandum Opinion and Order is amended to reflect that the dismissal is without prejudice to allow refiling in a jurisdiction with personal jurisdiction.